**Pages 1 - 18**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
ANDREA GOLLOHER, et al.,       )
                               )
         Plaintiffs,           )
                               )
  VS.                          )    NO. C 12-06002 RS
                               )
TODD CHRISTOPHER               )
INTERNATIONAL, INC., a Flordia )
corporation doing business as  )
VOGUE INTERNATIONAL; and KIM   )
MORRISON,                      )
                               )
         Defendants.           )
                               )
```

San Francisco, California
Thursday, April 3, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        LEXINGTON LAW GROUP LLP
        503 Divsadero Street
        San Francisco, California  94117
   **BY:  MARK N. TODZO, ATTORNEY AT LAW**

For Defendants:
        COWAN, LIEBOWITZ & LATMAN PC
        1133 Avenue of the Americas
        New York, New York 10036
   **BY:  ERIC J. SHIMANOFF, ATTORNEY AT LAW**
      **KIERAN G. DOYLE, ATTORNEY AT LAW**

Reported By:    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                      Official Reporter

```
 1   Thursday - April 3, 2014                              3:34 p.m.
 2                       P R O C E E D I N G S
 3                            ---oOo---
 4        THE CLERK:  Calling case C 12-6002, Golloher versus
 5   Todd Christopher International.
 6        Counsel, please state your appearances.
 7        MR. TODZO:  Good afternoon, Your Honor.  Mark Todzo
 8   representing plaintiffs.
 9        THE COURT:  Good afternoon.
10        MR. DOYLE:  Good afternoon.  Kieran Doyle and Eric
11   Shimanoff of Cowan, Liebowitz & Latman for defendant.
12        THE COURT:  Good afternoon.
13        This is on for final approval in this putative class
14   action, and it flows out of a case that came to us from the
15   Alameda Superior Court.
16        Let me go through some of the issues that I wanted to
17   address with you; and then we did get, as I understand it, some
18   objections, and we can go through those as well.  I don't know
19   if there are any objectors who are present.
20        MR. DOYLE:  Not that we're aware of.
21        MR. TODZO:  No.
22        THE COURT:  All right.  So no one indicated to any of
23   the parties that they intended to speak.  I thought somebody
24   wanted to, but okay.
25        MR. DOYLE:  I think, Your Honor, Mr. Barton had filed
```

1  a request to be heard, but has -- he was also an opt-out from
2  the class.
3          **THE COURT:** All right.  Okay.
4      Let me start through with some of the provisions that you
5  propose starting with the injunctive relief.  The injunctive
6  relief, as I understand it, is going to provide that where the
7  term "organic" is used in the hair care and skin care products,
8  that the agreement is it won't be used unless 70 percent of the
9  ingredients are organically produced; right?
10         **MR. TODZO:** That's correct, Your Honor.
11         **THE COURT:** Okay.  Can you highlight for me how the
12 relief here is somehow different than the relief that was
13 obtained in that prior Alameda Superior Court case, the Center
14 for Environmental Health?
15         **MR. TODZO:** Yes, Your Honor.
16      So here, this is a national class action.  The California
17 State Court consent judgment applied only to California.  So
18 the big difference, and this goes for both pieces of the
19 injunctive relief, both now apply nationally.  So whereas COPA
20 only applies in California, this relief spans throughout the
21 company.
22         **THE COURT:** Is the relief the same?  In terms of the
23 relief itself, is it the same and now it's being nationally
24 implemented?
25         **MR. TODZO:** I think there were some slight differences

1   but in concept, yes, it's similar.  It's essentially expanding
2   what was done in California nationally.
3           **THE COURT:**  Okay.  And the settlement fund is
4   6.5 million; right?
5           **MR. TODZO:**  That's correct.
6           **THE COURT:**  Okay.  And the provisions are the class
7   members who submit valid claims can recover $4 per product, and
8   they're capped out at 28 per class member; right?
9           **MR. TODZO:**  That's correct.
10          **THE COURT:**  And so that -- we've got at this point
11  68,000 class claims; right?  And so that would quantify out to
12  a payout to the class members of 1,724,112.
13          **MR. TODZO:**  Correct, Your Honor, except that number
14  went up slightly with the supplemental declaration of Mark
15  Rapazzini that was filed.  So now it's --
16          **THE COURT:**  Okay.  To what rough amount?
17          **MR. TODZO:**  I'm sorry?
18          **THE COURT:**  Go ahead.
19          **MR. TODZO:**  Yeah.  So now it's 1,724,484.
20          **THE COURT:**  Okay.  So I'll talk in a moment about the
21  fees issue; but fees will presumably reduce the $6.5 million
22  fund and then the 1.7, thereabout, payment to the class
23  members.  We're still going to have a pretty hefty ci pres
24  payout.
25          **MR. DOYLE:**  And there's also approximately $650,000

```
 1   for administrative fees.
 2           THE COURT:  Right.  Okay.
 3           MR. DOYLE:  But, yes.
 4           THE COURT:  All right.
 5           MR. TODZO:  So I did jot down the numbers if
 6   Your Honor would like.  Because assuming that Your Honor also
 7   approves the incentive awards, you know, I have the calculation
 8   as to what would be remainder for ci pres.
 9           THE COURT:  And what are the incentive awards in this
10   instance?
11           MR. TODZO:  Here there are two tiers.  The first tier
12   for the plaintiffs that were the initial plaintiffs, so there
13   were five of them, and they each engaged in substantial
14   discovery efforts, and as well as the settlement efforts, and
15   helping with the Complaint, et cetera.  So it's 1500 per person
16   for each of them.
17      And then for the subsequent plaintiffs that came in only
18   for the First Amended Complaint who didn't have to undergo
19   discovery, it's $250.  So a total of 9,000.
20           THE COURT:  So you've got some proportionality there.
21   I mean, it's not -- it's a significant addition to what the
22   average class member gets, but your argument would be it's
23   still within the balance of proportionality.
24           MR. TODZO:  That's correct, Your Honor.
25           THE COURT:  All right.
```

1        **MR. TODZO:**  So, I mean, if you want me to tally it up,
2   what that leaves for ci pres is 2,291,516.
3        **THE COURT:**  I mean, as we all know, you know it as
4   well as I do, that there is just a real -- a great deal of
5   skepticism that's floating up in various cases through the
6   appellate process about ci pres generally and how it's used.
7        In this instance you are proposing to use it as a
8   reversion is probably the wrong way to say it, but the basic
9   payout is to the class members and then there is a -- rather
10  than going back to defendants, which would create a significant
11  issue, it is a mechanism you're using for the overflow.
12       **MR. TODZO:**  Your Honor, that's correct, but it's much
13  more than that because here we did a substantial amount of
14  research to find two groups that we believe will greatly
15  further the goals not only of this lawsuit but also protect the
16  interests of the specific class members.
17       **THE COURT:**  Right.  That gets you over the *Kellogg*
18  problem.
19       **MR. TODZO:**  Correct.
20       **THE COURT:**  But there is still -- there's just some
21  question about just in what form ci pres is going to survive
22  going down the line as an alternative aspect of a class action
23  settlement.
24       I'm not proposing that this is an issue I'm going to
25  resolve in this case, but it's just something we have to be

1   aware of; that it's not perceived as an undisputed appropriate
2   benefit for these cases necessarily to have very large ci pres
3   distributions.
4       But I'm not suggesting I have a problem with the
5   particular recipients in this case.  I think you're right, that
6   they do have the appropriate nexus to the claims in the case;
7   and I'm just ruminating about where things are going to go in
8   this whole area of the law, but okay.
9       Could you go through with me the objectors?  The list of
10  objectors I have, the first one -- and some of these may be
11  dealt with in the opt-out context -- but Mr. Barden, I guess,
12  is an opt-out; right?
13          **MR. TODZO:**  That's correct.
14          **THE COURT:**  Okay.  To the extent -- even though he's
15  now opted out and can do battle as he sees fit, just -- that
16  doesn't mean I want to ignore his objections to the extent that
17  he pointed out things in the settlement that he thinks are
18  inappropriate; but as I understand, his objection is just he
19  would like more money for the class and quicker implementation
20  of the injunctive relief.
21      I suppose the question that seems to bubble up from that
22  objection is the prospect of increasing the payout to those
23  class members who made claims.  And on the one hand, you know,
24  certainly when the notice goes out, you don't want to move,
25  contrary to the notice, because people would perhaps otherwise

1  have made claims when they didn't, and that sort of problem.
2      But, perhaps, address for me why the argument that it
3  shouldn't be a greater recovery per class member as opposed to
4  utilizing part of the fund to go to ci pres.  Why don't you
5  just comment on that for me?
6      **MR. TODZO:**  Okay.  Your Honor, so there's always a
7  fine line when you're trying to devise the proper amount of a
8  payout under a class settlement.  So one of the things that I
9  like to do typically as class counsel, and that I think is
10 generally good practice, is to try to make it as easy as
11 possible to file a claim form.  Especially with a consumer
12 product that's an expendable consumer product, such as shampoos
13 and conditioners, it's highly unlikely that the class members
14 are going to retain any proof of purchase.
15     So the first order of business was we wanted to make it no
16 proof of purchase required.  So then, of course, when you go
17 that route, then you run the risk of fraudulent submissions,
18 fraudulent claims.
19     And so then there's the balance of, okay, how can we try
20 to maximize the recovery of -- reasonable recovery for class
21 members without enticing the fraudulent submitters to come --
22 you know, to come into play.  And that's where we -- you know,
23 that's sort of the balance that we drew.
24     The $4 per product is arguably, and probably more than
25 that, I would even concede that that's significantly more than

1  any premium we would have proven at trial.  I think the premium
2  that we had -- that our expert came out with was 11 percent, an
3  11 percent markup, which on a bottle of shampoo that sold for
4  $7 would be about 70 cents per product, and here we're doing
5  $4.
6      So, you know, on the one hand we're significantly
7  enhancing any potential damage with respect to individual
8  products.  On the other hand, true, we're potentially limiting
9  the number going from, you know, Mr. Barden said he purchased
10  40 products during the class period, which if you were to take
11  our 11 percent -- and this just is the way it worked out; I
12  didn't plan it like this -- but if you take the 11 percent
13  premium and you apply it to the 7-dollar shampoo price, you get
14  about 70 cents.  You multiply that by 40, and what do you get?
15  28.
16      So it just happens to work out that way here, and so the
17  $28 did seem to be a reasonable compromise to where we're
18  trying to strike a balance between wanting to compensate class
19  members who really purchased products and purchased a certain
20  number without forcing them to try to go back through their
21  memory bank and, you know, make up dates that they bought them,
22  or to present, you know, proof of purchase while at the same
23  time giving them a real recovery.
24      And $28, you know, granted, it's not a huge sum of money,
25  but at the same time these aren't large-dollar purchases

1  either.

2      So as consumer product settlements go, this seemed to be
3  at the higher end of what we've seen, but at the same time
4  reasonable under the circumstances.

5      **THE COURT:**  Okay.  Mr. or Ms. Morrison.  I don't know
6  if it's a Ms. or a Mr.

7      **MR. TODZO:**  It's a Ms.

8      **THE COURT:**  A Ms.

9      She objects that the class members weren't informed that
10  the claims would be diluted, but I think that's a moot point
11  because we didn't exhaust the claim fund.

12      **MR. TODZO:**  I would agree.

13      **THE COURT:**  Okay.  Ms. Hignite says the ci pres
14  distribution is improper.  We kind of covered that issue.

15      The attorneys' fee claim is excessive and not supported by
16  billing records.  Well, I'll talk about the fees in a moment.

17      The class period should be four years long instead of
18  five, and the release of Vogue's liability is too broad.

19      The five-year class period, I guess, is because the
20  limitations period is four years in many states; and so, again,
21  it's sort of a dilution question, I guess, but that's moot.

22      **MR. TODZO:**  Correct.

23      **THE COURT:**  Okay.  The scope of the release, I talked
24  about it, I think, at the preliminary approval, we discussed
25  it; and it was whether or not the language could be interpreted

1  to reach any mislabeling claim, including those that were
2  unrelated to the issues that were in the case.
3       And I think I got a fairly clear representation on the
4  record that it's more narrowly interpreted, and that it doesn't
5  cover any mislabeling claim.  It's those arising out of the
6  claims in this lawsuit.
7            **MR. DOYLE:**  That's right.
8            **MR. TODZO:**  That's correct.
9            **THE COURT:**  Okay.  Ms. Cochran objects to the
10 settlement on the ground that she thinks the award of
11 attorneys' fees to class counsel is unreasonably high -- I'm
12 afraid, Mr. Todzo, you are getting these objectors complaining
13 about you -- and that she's joining in Mr. Barden's objections,
14 but we've already dealt with those.
15      So that really does bring us just to a discussion, I
16 suppose, of the fees.  You're operating on the starting point
17 of 25 percent, the Ninth Circuit benchmark; right?
18           **MR. TODZO:**  That's correct, Your Honor.
19           **THE COURT:**  And then the lodestar cross-check, which
20 comes in a bit under what the 25 percent would be.
21      I suppose the first question is:  These are -- in this
22 particular case is it the Ninth Circuit benchmark that we're
23 applying or are we applying California law, which does not give
24 us the benchmark option?
25           **MR. TODZO:**  You know, Your Honor, that's a really good

1    question, and I was ruminating over that because, arguably,
2    under California law, it's a third or even higher.  And I
3    think --
4            **THE COURT:**  Or alternatively it's lodestar.
5            **MR. TODZO:**  Lodestar with a multiplier, correct.
6            **THE COURT:**  With a multiplier, yeah.
7            **MR. TODZO:**  But the reason why, after sort of
8    ruminating about it, I concluded that the federal standard, the
9    Ninth Circuit benchmark, was applicable was, one, every case
10   that I see that comes out of the Northern District applies it
11   even though California law is often being -- you know, so many
12   cases that are --
13           **THE COURT:**  I think I just had one where, perhaps,
14   that's not so.
15           **MR. TODZO:**  Right.  But I'm just saying, so it seemed
16   like the weight of authority was in favor of that, although
17   without really discussing it.
18       And then the second is that we do have -- it is a national
19   class.
20           **THE COURT:**  Right.
21           **MR. TODZO:**  And so we were applying -- and this is not
22   a case where we're taking the UCL and trying to apply it
23   nationally.  We're applying the laws of the several states to
24   their own states.
25           **THE COURT:**  Yeah.  I think that's probably the

stronger, for our purposes today, the stronger reason why a 25 percent approach that the Ninth Circuit tells us is the one to be applied here.

I think the first question on if it was clear that California law was driving everything in the case, I think -- I'm not sure that we could just fall back on the idea that a lot of Northern District cases have just said, "Well, I'm going to do the 25 percent."  But I don't think we're in that situation here so I'm not proposing we have to deal with it.

The one thing that you may know from one of my prior cases, if you looked at it, the much battled *Fraley versus Facebook* case, in that case I did apply the 25 percent to the net recovery so I deducted the administrative costs before I applied the benchmark.

So the figures that you propose, I don't think you did that.

**MR. TODZO:**  That's correct, Your Honor.  And, in fact, we did take, I thought, effort to sway you from that position.

**THE COURT:**  Right.

**MR. TODZO:**  And I did note that in that case you were particular to use the statement that, as appropriate here, you thought deducting it.

But then, as we argue in our papers, the prevailing Ninth Circuit, the weight of authority in the Ninth Circuit is to apply the 25 percent to the fund as a whole, the idea being

1  that, I guess, twofold.  The first being that the notice of
2  admin costs are there to benefit the class members, and I can
3  go through that in a second.
4      And the second being that there's just the general
5  proposition, the same reason why the attorneys' fees comes out
6  of the fund, so, too, should the notice and admin costs,
7  because those who benefit from the --
8          **THE COURT:**  They come out of the fund.
9          **MR. TODZO:**  No, I understand.  I understand.
10     But those who benefit from the, you know, the fund should
11 pay for the costs of implementing it.
12         **THE COURT:**  Well, I agree with you that it's a benefit
13 to the class, and that's why it is ascribable to the classes --
14 to the fund.
15     The question is:  Do you then say somehow beyond something
16 the class has to pay, for the attorneys' fees should be in some
17 ways calculated with the addition of those funds?
18     And I think I agree with what you've said, but I don't
19 think that necessarily leads to the conclusion that you apply
20 it with -- but I understand there are arguments going both
21 ways.  I'll go back and think about it.
22         **MR. TODZO:**  And, Your Honor, I think you actually
23 answered the question because typically, and I think this is
24 different than what you said in *Fraley*, because I think in
25 *Fraley* you had said you didn't view the notice and admin as a

1  benefit to the class.
2       And so you know, typically you'd count the fees.  The fees
3  are taken as a percentage of the class benefit.  And so if the
4  class benefit includes the notice and admin costs, then I think
5  it's appropriate to count the fees as a percentage of the
6  entire benefit inclusive.
7           **THE COURT:**  Well, maybe.  It could be sort of a
8  semantic thing.  What I -- I suppose all that I'm really saying
9  is, I'm not disputing that it's appropriate, when you establish
10 the settlement fund, to deduct those costs out of the
11 settlement fund.  In other words, you don't shift it onto --
12 there's a settlement fund and, by the way, the defendants have
13 to now pay the additional administrative costs.
14      So in that sense, by definition, it's coming out of a pool
15 of money which is the fund that the plaintiffs have gotten
16 identified.
17      So I'm not sure using the term is perhaps reading too much
18 into the benefit term, but let me go back and look at it.  I
19 understand the issues going both ways.
20      Okay.
21          **MR. TODZO:**  I'm sorry, Your Honor.  I just want to
22 make one other point --
23          **THE COURT:**  Sure.
24          **MR. TODZO:**  -- which is, with respect to, you know,
25 even if you were to deduct the notice and admin costs, I think

1   what that results in, if we were still seeking the 1.625, you
2   know, that fee award would represent 27.7 percent of the
3   reduced fund --
4           **THE COURT:**  Right.
5           **MR. TODZO:**  -- which we argue, and I think is correct,
6   that it's still justified under the facts and circumstances of
7   this case because, you know, we are talking about real
8   injunctive relief here.  This isn't elusive.
9       I know a lot of times, you know, on some of these labeling
10  cases counsel comes in and, you know, says, "Okay.  We're going
11  to move the word 'natural' from, you know, this part of the
12  label to the other part," or something like that.
13      I mean, here we -- I don't want to go so far as to say
14  it's unprecedented, but certainly there's very little precedent
15  for a company in a false advertising case being forced or
16  agreeing to change its federally registered trade name, one
17  that has, you know, broad national recognition.  And so that's
18  what we have here.
19      And, you know, I think that that's very wide-ranging
20  injunctive relief.  Injunctive relief, like I said, you don't
21  see in most of these false advertising cases, which has very
22  real benefit to, you know, okay, I mean, we hope that class
23  notice was perfect, but it's not perfect.  And so now class
24  members who are continuing to buy the products won't continue
25  to see the "Organics" brand name on the products.

1   **THE COURT:** I suppose to some extent, though, it does
2   kind of go back to the question that I started with about just
3   the jumping-off point of the Alameda County case, which you
4   certainly satisfied me that there is relief that transcends in
5   a significant fashion what was obtained in California in that
6   case; but in terms of the legal work and the effort that was
7   entailed in going from that result to this national injunctive
8   provision and then also the cash, you're saying I should,
9   depending on how I calculate it, go up even beyond the
10  benchmark.
11      What was it about this case that was warranting that?
12      **MR. TODZO:** Well, Your Honor, it is the first of its
13  kind. This is the very first case involving misleading organic
14  representations on a personal care product that has resolved in
15  any way, shape, or form. There's another case pending
16  downstairs, but that case hasn't resolved.
17      And so when you enter into a case like that, there is no
18  precedent. There's no -- I can't look and say, "Well, yeah, I
19  think we're going to prevail."
20      And, you know, granted, we had the knowledge and my firm
21  actually was representing the Center for Environmental Health
22  in that Alameda case so, yes, I was familiar with the law, but
23  how that would translate to an actual damages case because COPA
24  is limited to injunctive relief and attorneys' fees. And so
25  now we were bringing it over into the false advertising realm;

1  and so, you know, all the reasons why you have, you know,
2  enhancements, et cetera, on fees, you know, are very applicable
3  here because this is a cutting-edge kind of case.
4              **THE COURT:**  So in the California case there wasn't any
5  class fund, there was no payout to class members?
6              **MR. TODZO:**  No, not at all.
7              **THE COURT:**  It was just injunctive relief?
8              **MR. TODZO:**  That's correct, pursuant to a specific
9  statute that applies only in California.
10             **THE COURT:**  Right.  Okay.  Mr. Doyle, Mr. Shimanoff,
11 anything further you want to say?
12             **MR. DOYLE:**  No, Your Honor.  Thank you.
13             **THE COURT:**  Okay.  All right.  I will go back and take
14 a look.  You know, I don't have any other issues with respect
15 to the settlement that I need to review with you, and I'll just
16 go back and fine-tune it and give you an order.
17             **MR. TODZO:**  Great.  Thank you very much, Your Honor.
18             **MR. SHIMANOFF:**  Thank you, Your Honor.
19             **MR. DOYLE:**  Thank you, Your Honor.
20                  (Proceedings adjourned at 3:57 p.m.)
21                            ---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, June 16, 2014

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter